## THE CANADA.

*(District Court, D. Oregon.   May 5, 1881.)*

1. SHIP—MORTGAGE OF.

   A mortgagor of a ship in possession with the consent of the mortgagee is thereby authorized to make any change, addition, or repair thereon necessary and convenient for her preservation and use as a ship, so that it does not wilfully depreciate her value as a security to the mortgagee; and, in such case, the old material displaced by the new may be disposed of by the mortgagor as his property, unaffected by the mortgage.

2. SAME.

   But in case said material is not thus disposed of, and is left on board and passes into the possession of the mortgagee with the vessel, and is capable of being used in some form in its ordinary navigation, it would still be within the operation of the mortgage and belong to the mortgagee.

3. SAME.

   But if the old material, as such, is not suited for use in the navigation of the vessel, the fact that the mortgagor allows it to remain on board does not show that he did not intend to withdraw it from the operation of the mortgage, and appropriate it in exchange for the new material put in its place.

4. OLD COPPER.

   While the Canada was in posession of George Howes & Co., as mortgagors, and making the voyage from New York to Portland, Oregon, she was recoppered at Rio de Janeiro, and the old copper stowed in her hold and brought to Portland, when she was taken possession of by Sutton & Co., as mortgagees. *Held,* that the old copper was separated from the ship, and withdrawn from the operation of the mortgage, and was the property of the mortgagors.

In Admiralty.

*W. B. Gilbert,* for libellant.

*John H. Woodward* and *John W. Whalley,* for claimant.

DEADY, D. J.   In March, 1880, the ship Canada, of New York, owned by George and Jabez Howes, of that place, sailed for this port with a cargo of railway iron, and, on account of being compelled to put into Rio de Janeiro for repairs, did not reach her destination until March 4, 1881.

On and prior to the sailing of said vessel from New York, the Howes were indebted to the libellants, George Cornish and Rufus Hitchcock, of that place, in the sum of $660, for materials furnished and services rendered in repairing said vessel in the years of 1879 and 1880.

On March 9, Thomas F. McNeill and others, composing the crew of the vessel, brought suit against her for their wages; and on April 2, Effingham B. Sutton and others, constituting the firm of Sutton & Co., of New York, intervened for their interest as mortgagees in possession, to secure them against any liability they might incur by reason of having indorsed three certain notes of said Howes, in March and April, 1879, for the sum of $15,431.15, which they were afterwards compelled to pay, and petitioned that the proceeds of the vessel remaining after the payment of prior claims, including a balance of $11,759,19 due on a bottomry bond given for the repairs at Rio, and all the proceeds of 9,140 pounds of old copper then on board the vessel and taken off her at Rio and there replaced by new copper, might be applied upon the debt secured by said mortgage.

On March 31, 1881, the libellants commenced an action in the circuit court for the county of Multnomah against said Howes, for the recovery of said $660, and upon the same day procured a writ of attachment to issue therein against the property of the defendants therein, upon which writ said copper was duly attached.   At the date of said attachment said copper was stowed in the hold of said vessel, which was in the custody of the marshal of the district upon the warrant issued upon the libel of Thomas F. McNiell and others, aforesaid, and subject thereto, in the possession of said Sutton & Co., as mortgagees, which possession was obtained after the arrival of the vessel here by means of an action of replevin

commenced in the circuit court aforesaid, on March 5, 1881, in which no special mention was made of said copper. In the intervention of Sutton & Co. it is alleged that this old copper was and is included in the mortgage of the vessel, and that the same is in their possession on board the ship.

On April 6th the vessel, without the copper, was sold for $26,000, upon an interlocutory decree in the suit of McNiell and others, aforesaid; and on the same day a stipulation was entered into between Cornish & Hitchcock and Sutton & Co., stating the facts aforesaid concerning said copper, and that a controversy existed between said parties "as to whether or not said metal is included in or is now a part of the mortgaged property, or whether it should be applied upon the claim of said C. & H. by virtue of their attachment;" and consenting that said copper might be sold by the marshal, and that the proceeds, less the expenses of sale, should be held subject to the claim of each party, and the right of C. & H. to intervene and assert their claim in this suit.

Upon this stipulation an order was made for the sale of the copper, and it was sold by the marshal for $1,098.50.

No decided case in point has been found, but I think the question involved in the controversy may be satisfactorily answered by a careful consideration of the circumstances and purpose of the transaction, and a reference to the rules and principles which govern the rights of parties in the case of a mortgage of lands where the mortgagor remains in possession.

A mortgage of land includes everything annexed to the freehold at the date thereof, or that may become so annexed during the existence of the mortgage. *Winslow* v. *Merchants' Ins. Co.* 4 Met. 310. But a building or growing timber severed and removed from the mortgaged land, of which it formed a part when the mortgage was given, is thereby withdrawn from the operation of the mortgage. By reason of such removal they cease to be a part of the realty—the pledge. *Buckout* v. *Swift*, 27 Cal. 438.

The right of the mortgagor in possession to cut timber and remove fixtures, and dispose of them, is unlimited, unless re-

strained by a court of equity upon the impression that the land will thereby be rendered an insufficient security for the debt. *Brady* v. *Waldron*, 2 John. Ch. 148.

When Sutton & Co. took their mortgage upon the Canada, but left her in the possession and use of the mortgagors, they impliedly authorized the latter to make such changes, additions, and repairs in her fitment, tackle, apparel, and furniture as might be necessary and convenient for her preservation and use as a ship, so that they did not wilfully depreciate her value as a security for their debt. In pursuance of this authority, the Howes might, as mortgagors in possession, remove from time to time every part of this vessel, including her tackle, apparel, and furniture, and replace it with new, and dispose of the old and displaced material as their property, unaffected by the mortgage. But in case the old material was not so disposed of, and was left on board and passed into the possession of Sutton & Co. when they took possession of the ship, to whom it then would belong would depend on circumstances.

In the consideration of the question, I think it may be assumed that in the case of a *bona fide* repair, particularly where old material is displaced with new of equal or greater value, that the mortgagor has a right to dispose of the old material as his own. But where no such disposition is made of it, and it is suffered to remain on board as part of the ship's material, and is capable of being used in some form in the navigation of the vessel, I think the old material would still belong to the ship, remain a part of it, and be the property of the mortgagee in possession.

For instance, if the mortgagor in possession should put a new suit of sails on the vessel, and instead of disposing of the old ones should stow them away as suitable material for mending or supplying a rent or lost sail, such old material would remain within the operation of the mortgage and pass to the mortgagee in possession. Under those circumstances the reasonable inference would be [that while the mortgagor had, for the safety and convenience of the vessel, added to the value

of the security by the cost of the new sails, (*Southworth* v. *Isham*, 3 Sand. 448,) yet he did not intend to appropriate or divert the old ones from the use of the ship or the operation of the mortgage. Applying these suggestions to the case under consideration, it appears to me that this old copper, as soon as it was removed from the sides of the vessel and its place supplied with new, became the property of the mortgagors. Upon this conclusion, the master must have disposed of the 2,000 additional pounds which he sold at Rio, as the property of the mortgagors, for $240; and he probably would have disposed of the remainder in the same way if it had not been thought best to bring it here for a better market, which has proved the case.

No practical use has been shown, or even suggested, to which this copper could be applied in the ordinary navigation or use of the vessel; and therefore, although it was suffered to remain on board until the mortgagee took possession, there is no reason to conclude that the mortgagors did not intend to separate it from the mortgaged property—the vessel—and appropriate it to their own use in exchange for the new. Indeed, there is not a single circumstance connected with the transaction which tends to prove that the old copper was not only actually taken off from the sides of the ship, but legally separated from it and its uses, so that it was no longer a part of it. And, finally, the value of the security of Sutton & Co. has been enhanced rather than diminished by the exchange, and therefore there is no particular merit in their claim. Under these circumstances, this copper was and is the property of George and Jabez Howes, and therefore liable to the attachment of the libellants in their action in the state court to recover the sum due them from said Howes, and they thereby acquired a valid and subsisting lien thereon for the amount of their claim and the costs of their action..

The fund arising from the sale of the copper, less the expense of sale and this litigation, must, therefore, be delivered to the sheriff, with the writ of attachment, to keep, subject to the exigencies of such writ.